UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM HEIDERMAN and | ) | |
| JULIE HEIDERMAN as personal | ) | |
| representatives of BERNICE HEIDERMAN, | ) | |
| WILLIAM HEIDERMAN, JULIE | ) | |
| HEIDERMAN, and GRACE HEIDERMAN | ) | |
| | ) | No. 20 C 7579 |
| Plaintiff, | ) | |
| | ) | Judge Lefkow |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES' MEMORANDUM
<u>IN SUPPORT OF ITS MOTION TO DISMISS</u>**

**Table of Contents**

Table of Authorities ....................................................................................................... ii

Introduction .................................................................................................................... 1

Background...................................................................................................................... 2

    I.      Heiderman's Illness and Death .......................................................................... 2

    II.     Event Following Heiderman's Death................................................................. 4

    III.    This Lawsuit………………………………………………………………….....5

Argument......................................................................................................................... 7

    I.      Motion to Dismiss Standard .............................................................................. 8

    II.     Wrongful Death Claim (Count I)....................................................................... 8

            A.      FTCA's Foreign Count Exception Bars the Wrongful Death Claim ............................................................................................ 9

            B.      FECA Bars the Wrongful Death Claim.................................................. 13

    III.    Negligent Handling of Remains (Count IV) ..................................................... 19

    IV.    Intentional Infliction of Emotion Distress (Count II) ........................................ 21

    V.     Negligent Infliction of Emotional Distress (Count III)..................................... 25

Conclusion .................................................................................................................... 27

**Table of Authorities**

Cases

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................2, 8

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007) ..........................................................8

*Brownback v. King*, No. 19-546, 2021 WL 726222 (U.S. Feb. 25, 2021) ....................9

*Bruni v. United States*, 964 F.2d 76 (1st Cir. 1992) ......................................................18

*Chang Hyun Moon v. Kang Jun Liu*, 44 N.E.3d 1134 (Ill. App. Ct. 2015) .................21

*Cobige v. City of Chicago*, 2009 WL 2413798 (N.D. Ill. Aug. 6, 2009) ......................22

*Deloria v. Veterans Administration*, 927 F.2d 1009 (7th Cir. 1991) ...........................20

*Doe v. Loyola U. of, Chic.*, 2019 WL 3801819 (N.D. Ill. Aug. 13, 2019)..............25, 26

*Evers v. Astrue*, 536 F.3d 651 (7th Cir. 2008) ................................................................8

*Ezekiel v. Michel*, 66 F.3d 894 (7th Cir. 1995) ........................................................13, 15

*Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471 (1994) ...........................................9

*Feltmeier v. Feltmeier*, 207 Ill.2d 263 (Ill. 2003) .......................................................21

*Figueroa v. United States*, 7 F.3d 1405 (9th Cir. 1993) ...............................................17

*Fuqua v. U.S. Postal Service*, 607 Fed. App'x 570 (7th Cir. 2015) ........................14, 17

*Fuqua v. United States Postal Service*, 956 F.3d 961 (7th Cir. 2020) .........................14

*Gill v. United States*, 471 F.3d 204 (1st Cir. 2006) ......................................................17

*Gross v. Dev. Alts., Inc.,* 946 F. Supp. 2d 120 (D.D.C. 2013).......................................12

*Gustafson v. Thomas*, 2012 WL 1866407 (N.D. Ill. May 22, 2012) ............................18

*Harbury v. Hayden,* 522 F.3d 413 (D.C. Cir. 2008) ...............................................11, 12

*Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741 (7th Cir. 2010) .........................................8

*Janowsky v. United States*, 913 F.2d 393 (7th Cir. 1990) .............................................19

*LaLoup v. United States*, 29 F. Supp. 3d 530 (E.D. Pa. 2014) .....................................23

*Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698 (7th Cir. 2009) ...............................................25

*Lewis v. School Dist. #70*, 523 F.3d 730 (7th Cir. 2008) ...............................................22

*Lindahl v. Office of Personnel Management*, 470 U.S. 768 ...............................................14

*Lockheed Aircraft Corp. v. United States*, 460 U.S. 190 (1983) ...............................................14, 15

*Luczyszyn v. G.S.A,* 569 F. Supp. 306 (E.D. Pa. 1983) ...............................................17, 18

*Mathirampuzha v. Potter*, 548 F.3d 70 (2d Cir. 2008) ...............................................17

*Moe v. United States,* 326 F.3d 1065 (9th Cir. 2003) ...............................................15

*Mogul v. SCI Ill. Services, Inc.,* 2019 WL 4138214 (Ill. App. Ct. Aug. 30, 2019) ...............................................23

*Nicklas v. United States*, 2014 WL 309323 (N.D. Ill. Jan. 27, 2014) ...............................................20

*Noble v. United States*, 216 F.3d 1229 (11th Cir. 2000) ...............................................17, 18

*Parrish v. United States*, 425 F. Supp. 1283 (M.D. Fl. 2006) ...............................................11

*Parrott v. United States*, 536 F.3d 629 (7th Cir. 2008) ...............................................9

*Richards v. United States,* 369 U.S. 1 (1962) ...............................................9

*Richards v. U.S. Steel*, 869 F.3d 557 (7th Cir. 2017) ...............................................22

*Sasse v. United States*, 201 F.2d 871 (7th Cir. 1953) ...............................................14

*Schneider v. United States*, 936 F.2d 956 (7th Cir. 1992) ...............................................19

*Schweihs v. Chase Home Fin.*, 77 N.E.3d 50 (Ill. 2016) ...............................................21, 22, 25, 26

*Serrano v. Guevara*, 315 F. Supp. 3d 1026 (N.D. Ill. 2018) ...............................................2

*Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004) ...............................................10, 11

*Stennis v. Armstrong*, 2019 WL 6327422 (N.D. Ill. Nov. 26, 2019) ...............................................17

*Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81 (1991) ...............................................15

*Taliani v. Resurrection*, 115 N.E.3d 1245 (Ill. App. Ct. 2018) ...............................................23

*Throckmorton v. Director of the U.S. Peace Corps.*, 787 F.2d 593 (6th Cir. 1986) ...............................................15, 16

*Tippetts v. United States*, 308 F.3d 1091 (10th Cir. 2002) ..................................................... 15, 17

*Travelers Prop. Cas. v. Good*, 689 F.3d 714 (7th Cir. 2012) ..................................................... 8

*United States v. Kwai Fun Wong,* 575 U.S. 402 (2015) ........................................................... 9

*United States v. Neustadt*, 366 U.S. 696 (1961) ..................................................................... 19

*White v. United States*, 143 F.3d 232 (5th Cir. 1998) .............................................................. 18

## Statutes

5 U.S.C. § 8102 ...................................................................................................................... 13

5 U.S.C. § 8116(C) ............................................................................................................. 13, 14

5 U.S.C. § 8124 ...................................................................................................................... 14

5 U.S.C. § 8128 ...................................................................................................................... 14

5 U.S.C. § 8128(b) .................................................................................................................. 14

5 U.S.C. § 8142 ...................................................................................................................... 15

5 U.S.C. § 8145 ...................................................................................................................... 13

28 U.S.C. 2680(h) ................................................................................................................... 19

28 U.S.C. § 1346 ..................................................................................................................... 14

28 U.S.C. § 1346(b)(1) ............................................................................................................. 9

28 U.S.C. § 2680(a)-(n) ............................................................................................................ 9

28 U.S.C. §§ 1346(b) ............................................................................................................ 1, 9

## Rules

Fed. R. Civ. P. 12(b)(1) ........................................................................................................... 8

Rule 12(b)(6) ........................................................................................................................... 9

**Introduction**

This lawsuit arises from the tragic and untimely death of Peace Corps member, Bernice Heiderman, from undiagnosed malaria on the island nation of Comoros on January 9, 2018. As a result of the events preceding and subsequent to Heiderman's death, and pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680, Bernice Heiderman's estate brings a wrongful death claim, and plaintiffs William Heiderman, Julie Heiderman, and Grace Heiderman bring claims for negligent infliction of emotional distress, intentional infliction of emotional distress, and the negligent handling of remains. While Bernice Heiderman's death was tragic and undoubtedly devasting for her family, plaintiffs' claims must be dismissed for multiple independent reasons. First, this court lacks subject matter jurisdiction over the estate's wrongful death claim because the FTCA's foreign-country exception bars this claim. The court also lacks subject matter jurisdiction over the wrongful death claim because the exclusive remedy for this injury (Heiderman's death) is available through the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8102, *et seq.* Next, the family's "negligent handling of remains" claim is barred by the FTCA's intentional tort exception because any allegations that the United States failed to convey accurate information regarding the shipment and delivery of Heiderman's remains is a thinly veiled misrepresentation claim, which is barred by the FTCA. Finally, plaintiffs have failed to state claims for intentional infliction of emotional distress and negligent infliction of emotional distress. Thus, the court should grant the United States' motion to dismiss and dismiss this lawsuit.

## Background[1]

Bernice Heiderman joined the Peace Corps in July of 2016 and was assigned to the African island nation of Comoros, which is in the Indian Ocean between Madagascar and Mozambique. Dkt. 1, Compl. ¶ 28. The Peace Corps is a federal agency. *Id.* ¶ 6. During her time as a Peace Corps volunteer, Heiderman taught English to junior high students at a school in Moroni, the capital of Comoros. *Id.*

## I.      Heiderman's Illness and Death

Heiderman told her mother that she began experiencing nausea "while she was away" for the New Year's Eve 2017 holiday. *Id.* ¶ 33. The next day, Heiderman texted her mother and told her that she had chills, might have a fever, and felt as if she was in a fog. *Id.* ¶ 34. Heiderman's mother instructed her to see a Peace Corps doctor. *Id.* The Peace Corps Medical Officer for Comoros was Dr. Nizar Ahamada Said, and the Peace Corps medical assistant was Anturia Mihidjai. *Id.* ¶¶ 35, 39. Heiderman saw Dr. Said on January 2, 2018, and reported to him that she was suffering from headaches, dizziness, fever, and vomiting. *Id.* ¶¶ 40-41. In response, Dr. Said gave Heiderman an antacid and aspirin and sent her back to her living quarters (presumably to rest). *Id.* ¶ 43.

Two days later, Heiderman saw Dr. Said again and reportedly told him that she was not better and that all her symptoms were continuing. *Id.* ¶ 46. In response, Dr. Said placed Heiderman on a medical hold and moved her to a hotel. *Id.* ¶ 47. On January 5, Heiderman told her mother, via text, that Dr. Said believed that Heiderman was suffering from dehydration or the flu. *Id.* ¶¶

---

[1] In a motion to dismiss, the court construes all factual allegations as true and draws all reasonable inferences in the plaintiff's favor. *Serrano v. Guevara*, 315 F. Supp. 3d 1026, 1031 (N.D. Ill. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). However, the United States does not concede that all of the plaintiffs' allegations are true or accurate.

54, 56.  Plaintiffs allege that medical records do not include any entries for January 6 or 7.  *Id.* ¶ 58.

Heiderman was still sick on January 8.  *Id.* ¶ 64.  On that day, plaintiffs allege that Dr. Said again gave Heiderman an antacid, aspirin, and an antihistamine.  Plaintiffs allege that Dr. Said attempted to administer an IV but was unsuccessful (the medical records indicate otherwise).  *Id.* Over the next 24 hours, Heiderman's condition deteriorated and, in the early hours of January 9, Heiderman collapsed in the hotel bathroom and became unresponsive.  *Id.* ¶ 71.  The Peace Corps's medical assistant performed CPR but was unable to revive Heiderman.  *Id.*  Tragically, Heiderman died on January 9, 2018.  A subsequent test and autopsy revealed that Heiderman died from malaria.  *Id.* ¶¶ 75-78.

Heiderman's estate alleges that the Peace Corps failed to follow its own policies while treating Heiderman and, specifically, that it failed to administer a malaria test to Heiderman. The estate alleges that the Peace Corps's policy directs medical personnel to "assume that all Volunteers serving in malaria endemic areas could become infected with malaria" and to "always consider a diagnosis of malaria in any Volunteer." *Id.* ¶ 51.  The estate also alleges that the Peace Corps's medical officials in Washington, D.C., failed to address Heiderman's deteriorating condition.  *Id.* ¶¶ 60-61.  For example, the estate alleges that the Peace Corps's medical officials in Washington D.C. failed to medically evacuate Heiderman.  *Id.* ¶¶ 61-62, 74.  The estate also alleges that the Peace Corps's medical officer in Washington D.C., Dr. Alison Colantino, was monitoring the situation and instructed Dr. Said to perform blood tests and monitor Heiderman's vital signs, and that she failed to order a malaria test for Heiderman.  *Id.* ¶¶ 68-69, 73-74.

3

## II.    Events Following Heiderman's Death

Plaintiffs allege that the Peace Corps's actions following Bernice's death were callous and constituted a "failure of common decency." *Id.* ¶ 89.  On the day of her passing, a Peace Corps representative called Bernice's parents, William and Julie Heiderman, and informed Bernice's father of the death.  Compl. ¶¶ 90-91.  Upon hearing the news, William Heiderman asked the representative why Bernice had not been evacuated, and plaintiffs allege that the representative "went into damage control mode" and told Bernice's father "your daughter did not die of infection." *Id.* ¶ 92.  Plaintiffs also allege that Peace Corps representatives made things worse during a series of subsequent phone calls when representatives allegedly told the family: (1) the agency "never knew Bernice was seriously ill," (*id.* ¶ 92); (2) the death was "her own fault" because she "probably did not take her medication" (*id.* ¶ 95); (3) Bernice "should have told us she was really sick," (*id.* ¶ 96); and (4) Bernice "never told the doctor that she needed to be tested for malaria," (*id.* ¶ 97).

Plaintiffs also allege that the Peace Corps "bungled the schedule" for the return of Heiderman's remains and repeatedly made misrepresentations regarding when Heiderman's remains would arrive in the United States.  An autopsy was performed on or around January 18, 2018, and preliminary findings were provided to the family on January 24, 2018.  *Id.* ¶¶ 77-78.  The Heidermans complain that Bernice's remains did not arrive in Chicago on time and, instead, the remains arrived four days after her funeral took place.  *Id.* ¶ 104.  Heiderman's funeral took place on January 20, 2018, and Heiderman's remains arrived in Chicago a few days later.  *Id.* ¶¶ 103, 104.  The Heidermans complain that when they asked where Bernice's remains were in transit, a Peace Corps's representative allegedly said, "we are not sure." *Id.* ¶ 101.  Plaintiffs also allege that a Peace Corps's official said that the reasons for the various delays was one of "efficiency,"

4

and that the Peace Corps wanted to "save money by waiting to send Ms. Heiderman's body until it had enough cargo to justify the shipping expense." *Id.* ¶ 105. The Heiderman's also complain that when Bernice's remains arrived at O'Hare airport, the Department of Homeland Security originally told them that they could not meet Heiderman's remains on the tarmac; however, they were eventually permitted to receive the remains on the tarmac after a United Airlines employee intervened. *Id.* ¶¶ 107-108.

Further, the Heidermans also allege that the Peace Corps acted insensitively when notifying the Heidermans that donations were made in Bernice's honor. Specifically, plaintiffs claim that they received "more than 30 letters from the Peace Corps about donations that had been made in their daughter's memory." *Id.* ¶ 109. In the letters, the Peace Corps shared the "good news" that money donated in Bernice's honor would be used to, among other things, "facilitate malaria prevention workshops." *Id.* Plaintiffs claim that this statement was "a cruel inclusion given that, at the time, the agency knew or should have known that it was Peace Corps's own failure to diagnose, treat, or even address malaria that caused Ms. Heiderman's untimely death." *Id.*

### III. This Lawsuit

William and Julie Heiderman, on behalf of Bernice Heiderman's estate, presented an administrative tort claim to the Peace Corps on October 18, 2019. Compl. ¶ 8. William Heiderman, Julie Heiderman, and Grace Heiderman (Bernice's sister) also presented administrative tort claims to the Peace Corps on the same day. *Id.* All these claims were denied on July 22, 2020. *Id.* ¶ 9.

Plaintiffs brought this timely lawsuit on December 18, 2020. Dkt. 1, Compl. "As personal representatives" of Bernice Heiderman, William and Julie Heiderman assert a wrongful death claim (Count I). In support of this claim, the estate alleges that Heiderman's death was caused by the Peace Corps's negligent medical care. Specifically, the estate alleges that the Peace Corps was

negligent in the training and supervision of its medical personnel; it failed to adequately respond and diagnose Bernice's illness; and it failed to medical evacuate Heiderman from Comoros to the United States. Compl. ¶ 122. The estate also alleges that the death "only occurred in a foreign country because Peace Corps ignored its own prescriptive evacuation mandate." *Id.* ¶ 123. Further, because of the Peace Corps's actions, Bernice died at a young age and was, thus, unable to have a profitable career. *Id.* ¶¶ 126, 128.

William and Julie Heiderman, as well as Bernice's sister, Grace Heiderman, bring three additional claims: intentional infliction of emotional distress (Count II), negligent infliction of emotional distress (Count III), and negligent handling of remains (Count IV). In support of their intentional infliction of emotional distress claim (Count II), the plaintiffs allege that the Peace Corps' actions were extreme and outrageous and caused the Heiderman family to suffer emotional distress. Specifically, the Heiderman family alleges that the Peace Corps inflicted emotional distress when it: (1) blamed Bernice for her own death; (2) argued with the Heiderman family that Bernice should have "self-diagnosed her own illness"; (3) earmarked donations made on Bernice's behalf for "malaria prevention"; and (4) bungled the return of Heiderman's body to the family. Compl. ¶ 134. The Heiderman family alleges that it has suffered emotional and physical distress as a result of the Peace Corps's actions. *Id.* ¶ 139.

In support of their negligent infliction of emotional distress claim (Count III), the family alleges that the Peace Corps owed a duty of care to the family, which arose out of special circumstances because the Peace Corps "caused the underlying death" and should have known that the family was susceptible to emotional distress. *Id.* ¶ 144. Similar to their intentional infliction of emotional distress claims, the family alleges that the Peace Corps's actions following Bernice's

death caused emotional distress for the family. *Id.* ¶ 145. Likewise, because of the Peace Corps's actions, the family has suffered emotional and physical distress. *Id.*

Finally, the Heiderman family alleges that the Peace Corps negligently handled Heiderman's remains (Count IV). The family states that the Peace Corps owed them a duty of care in the agency's treatment of Bernice's remains. *Id.* ¶ 152. The Heiderman family alleges that the Peace Corps breached its duty of care when it "negligently interfered with the Heiderman family's timely possession of Ms. Heiderman's body," that its actions caused Bernice to "miss her own funeral," and that the Peace Corps' actions were wrongful when it "could not tell the Heiderman family where Ms. Heiderman's body was located." *Id.* ¶ 152.

## Argument

Bernice Heiderman was a dedicated and passionate Peace Corps volunteer and, undoubtedly, a beloved daughter and sister. Her death was tragic. The United States cannot change this fact. However, her family cannot convert the events that occurred in Comoros into an actionable complaint. Indeed, the complaint fails for numerous independent reasons. First, the estate's wrongful death claim is barred by the FTCA's foreign-country exception, and the court also lacks subject matter jurisdiction over the wrongful death claim because the exclusive remedy for this wrong (Heiderman's death) is available exclusively through FECA. Next, the family's negligent handling of remains claim should be dismissed because the FTCA's intentional tort exception deprives this court of jurisdiction over this claim. The family also fails to state a claim for intentional infliction of emotional distress because the conduct alleged is neither extreme nor outrageous. Finally, the plaintiffs' negligent infliction of emotional distress claim must be dismissed because the family fails to (and cannot) allege that they suffered a *contemporaneous*

physical impact or injury—a required element of this claim. Thus, the court should grant the United States' motion to dismiss and dismiss this lawsuit.

## I. Motion to Dismiss Standard

Fed. R. Civ. P. 12(b)(1) requires dismissal when courts lack subject matter jurisdiction. In evaluating a Rule 12(b)(1) motion, the court must "accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff." *Evers v. Astrue*, 536 F.3d 651, 656 (7th Cir. 2008) (citation omitted). The party asserting federal jurisdiction has the burden of proving that jurisdiction is proper. *Travelers Prop. Cas. v. Good*, 689 F.3d 714, 722 (7th Cir. 2012).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Any well-pled facts are taken as true and viewed in the light most favorable to the plaintiff. *Hatmaker v. Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010). However, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, (2007).

## II. Wrongful Death Claim (Count I)

This court lacks subject matter jurisdiction over the estate's wrongful death claim because it is barred by the FTCA's foreign country exception and, alternatively, FECA provides the exclusive remedy for a volunteer who dies during the course of her Peace Corps service.[2]

---

[2] While Peace Corps volunteers are not federal employees, Peace Corps are entitled to disability and death benefits under FECA. *See* 5 U.S.C. § 8142, 5 § U.S.C. 8101(1)(B). Likewise, Peace Corps volunteers are considered employees for purposes of the FTCA. *See* 22 U.S.C. § 2504(i).

## A. FTCA's Foreign Country Exception Bars the Wrongful Death Claim.

The essence of the estate's wrongful death claim is that the Peace Corps' medical personnel provided negligent medical care to Heiderman and, as a result, Heiderman died from undiagnosed malaria. Simply put, the injury that the estate complains of (Heiderman's death) occurred in the foreign country of Comoros and, thus, the FTCA's foreign country exception bars this claim.

It is axiomatic that the United States, as a sovereign, may be sued only to the extent that it has consented to suit. *Federal Deposit Ins. Corp. v. Meyer,* 510 U.S. 471, 475 (1994). Through the FTCA, Congress has granted federal district courts jurisdiction over claims arising out of any actions seeking money damages from the United States for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, the statute waives "the sovereign immunity of the United States from suits in tort, and with certain specific exceptions, . . . render[s] the Government liable in tort as a private individual would be under like circumstances." *Richards v. United States,* 369 U.S. 1, 6 (1962).

However, if a claim falls within any exception to the FTCA, sovereign immunity has not been waived, and the district court lacks jurisdiction to hear the case.[3] One "significant limitation"

---

[3] The Seventh Circuit (alone) has held that the FTCA defenses are not "jurisdictional." *Parrott v. United States*, 536 F.3d 629, 634 (7th Cir. 2008) ("The statutory exceptions enumerated in § 2680(a)-(n) to the United States's waiver of sovereign immunity (found in § 1346(b)) limit the breadth of the Government's waiver of sovereign immunity, but they do not accomplish this task by withdrawing subject-matter jurisdiction from the federal courts."). But that outlier position was in doubt after *United States v. Kwai Fun Wong,* 575 U.S. 402, 411-12 (2015), and it seems even more in doubt as a result of the decision a few weeks ago in *Brownback v. King*, No. 19-546, 2021 WL 726222, at *5 (U.S. Feb. 25, 2021), holding that "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." Contrary to the Seventh Circuit's reasoning, the Court in *Brownback* seems to equate sovereign immunity with jurisdiction. *Id.*

on the FTCA's waiver of sovereign immunity is its "exception for '[a]ny claim arising in a foreign country,'" or what is commonly referred to as the foreign country exception. *Sosa v. Alvarez-Machain,* 542 U.S. 692, 700 (2004) (quoting 28 U.S.C. § 2680(k)). The Supreme Court has unequivocally explained that "the FTCA's foreign country exception bars all claims based on *any injury suffered in a foreign country*, regardless of where the tortious act or omission occurred." *Sosa,* 542 U.S. at 712 (emphasis added).

The estate's wrongful death claim is based entirely on an injury suffered in Comoros—the death of Heiderman. As a preliminary matter, there can be no question that Comoros is a foreign country. Next, the complaint makes clear that Heiderman was living in a foreign country when she contracted malaria, she was in Comoros as her condition deteriorated, she received all of her medical care in Comoros, and she passed away in Comoros. Simply put, it is the place of the injury, not the conduct, that controls application of the foreign country exception. *Sosa*, 542 U.S. at 712. Ultimately, Heiderman died in Comoros and, thus, the estate's wrongful death claim is based on her injury that occurred in a foreign country. Thus, the FTCA's foreign country exception bars the estate's wrongful death claim.

Next, it is of no consequence that the estate attempts to frame the allegations in the context of decisions and actions that occurred in Washington, D.C., because the Supreme Court has rejected this theory of liability (referred to as the "headquarters theory"). A "headquarters theory" incorporates allegations in which conduct in the United States is alleged to have proximately caused injuries suffered in a foreign country. *See Sosa,* 542 U.S. at 701-04 (explaining that

---

("Because [plaintiff's] tort claims failed to survive a Rule 12(b)(6) motion to dismiss, the United States necessarily retained sovereign immunity, also depriving the court of subject-matter jurisdiction."). If the court desires further briefing addressing whether the FTCA defenses are jurisdictional, the United States can submit a supplemental brief. At this point, the difference between a jurisdictional defense and a failure-to-state-a-claim defense is unimportant.

"domestic proximate causation under the headquarters doctrine fail[s] to eliminate application of the foreign country exception"); *Harbury,* 522 F.3d 413, 423 (D.C. Cir. 2008) (following "the lead of *Sosa* and declin[ing] to allow . . . creative pleading to water down the foreign-country exception to the FTCA"). Such claims usually "involve allegations of negligent guidance in an office within the United States of employees who cause damage while in a foreign country, or of activities which take place within a foreign country." *Sosa*, 542 U.S. at 701. However, in *Sosa*, the Supreme Court recognized the problem that a headquarters theory evokes—"it will virtually always be possible to assert that the negligent activity that injured the plaintiff [abroad] was the consequence of faulty training, selection or supervision . . . in the United States." *Id.* at 702; *see also id.* ("The headquarters doctrine threatens to swallow the foreign country exception whole, certainly at the pleadings stage."). Thus, the Supreme Court has emphatically rejected the "headquarters' theory of liability.

In support of the wrongful death claim, the estate alleges that the Peace Corps's medical personnel in Washington D.C. failed to train its medical personnel, negligently supervised the medical personnel, and failed to adequately respond to Heiderman's illness. Compl. ¶ 122. The estate then alleges that these acts were "committed by Peace Corps officials, employees, and staff at Peace Corps headquarters in Washington, DC." *Id.* ¶ 123; *see also* ¶ 121 ("Peace Corps officials and employees, specifically those at headquarters in Washington, DC, breached this duty"). The estate's theory of liability is a classic example of the "headquarters theory" of liability. Because the Supreme Court has expressly stated this theory of liability is not cognizable, this court should dismiss claims based on these allegations. *See, e.g., Parrish v. United States*, 425 F. Supp. 1283 (M.D. Fl. 2006) (concluding that the plaintiff's FTCA claim alleging that the United States government negligent failed to train one of its military drivers who then caused an accident in Iraq

was barred by the FTCA's foreign country exception); *see also Gross v. Dev. Alts., Inc.,* 946 F. Supp. 2d 120, 124 (D.D.C. 2013) ("Plaintiffs first suggest that, because USAID's negligent direction and oversight occurred in the United States, the foreign-country exception should not apply. . . . But that line of reasoning is precisely what *Sosa* rejected.").

Further, the court should also reject the estate's attempt to relocate its injuries back to the United States. The wrongful death claim attempts to focus on the injuries that the Heiderman family has suffered in the United States because of Heiderman's passing. The complaint alleges that Heiderman's death has caused "Plaintiffs to lose Ms. Heiderman's support, care, companionship, and advice." Compl. ¶ 129. The estate also alleges that her parents are their daughter's next of kin and, thus, they are eligible to "recover for the damage they have suffered from" the wrongful death. *Id.* ¶ 124. However, other district courts have rejected similar attempts to plead around the foreign country exception. In *Klayman v. Obama*, the plaintiffs brought various claims against the United States claiming they suffered "severe emotional distress" and "the loss of society, earnings, companionship, [and] comfort" as a result of violence that broke out in Israel, which resulted in injuries to their relatives in Israel. 125 F. Supp. 3d 67, 85-86 (D.D.C. 2015). The district court concluded that the FTCA's foreign country exception barred these claims despite the plaintiffs "attempt to relocate their injuries back to the United States." *Id.*; *see also Harbury v. Hayden,* 522 F.3d at 422-23 (holding that the plaintiff's "claims on behalf of her husband's estate arise in Guatemala because he suffered the alleged injuries there" and "to the extent Harbury alleges her own emotional injuries in the United States as a result of the death of her husband, those derivative claims similarly arise in Guatemala for purposes of the FTCA"); *see also Gross*, 946 F. Supp. 2d 120 (D.D.C. 2013) (rejecting plaintiff's loss of consortium claim based upon the long-term imprisonment of her husband in Cuba). Put another way, the foreign country

exception bars claims for injuries that are derivative of injuries suffered in a foreign country. Thus, the estate's claim and the family's damages resulting from Heiderman's death are barred because they are derivative of the injury sustained in a foreign country. *See, e.g., Placencia v. United States*, 2017 WL 3017708, at \*2-3 (S.D. Cal. July 14, 2017) (foreign country exception barred the plaintiffs' wrongful death claims and emotional distress claim and noting that "other federal courts have applied the FTCA's foreign country exception to claims that are necessarily derivative of injuries sustained in a foreign country"). Ultimately, the FTCA immunizes the United States from suit for injuries arising in Comoros and, thus, the estate's wrongful death claim should be dismissed.

### B. FECA Bars the Wrongful Death Claim

The estate's wrongful death claim should be dismissed for another independent reason—the Federal Employees Compensation Act, 5 U.S.C. § 8101, *et seq.,* withdraws subject matter jurisdiction from the court over claims stemming from Heiderman's death while serving with the Peace Corps. Subject to some exceptions not applicable in this case, FECA provides the *exclusive* remedy for a federal employee who dies while at work. At the very least, a "substantial question" of whether FECA coverage exists in this case, which could require a determination by the Department of Labor. Accordingly, this claim should be dismissed (or stayed until a FECA claim is presented and a determination is made).

FECA requires the United States to "pay compensation as specified . . . for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty[.]" 5 U.S.C. § 8102(a). This liability is "exclusive and instead of all other liability of the United States . . . under a Federal tort liability statute." 5 U.S.C. § 8116(c); *Ezekiel v. Michel*, 66 F.3d 894, 898 (7th Cir. 1995) (FECA "supplants all other liability" to a federal employee with

"work-related injuries."); *see also Sasse v. United States*, 201 F.2d 871, 873 (7th Cir. 1953) (discussing the preclusive effect of FECA). Congress enacted this statute as a compromise similar to most worker compensation schemes. "[E]mployees are guaranteed the right to receive immediate, fixed benefits, regardless of fault and without need for litigation, but in return they lose the right to sue the Government." *Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 194 (1983).

The Secretary of Labor has exclusive authority to resolve any disputes regarding the scope of FECA coverage. 5 U.S.C. § 8145; *see also Fuqua v. United States Postal Service*, 956 F.3d 961, 964 (7th Cir. 2020). Pursuant to 5 U.S.C. § 8145 and FECA's implementing regulations, the Secretary of Labor has authorized the Office of Workers' Compensation Programs ("OWCP") to adjudicate and process claims for benefits under the FECA. *See* 20 C.F.R. § 1.1. FECA claims are reviewed by the OWCP to determine if a claimant's injuries are covered under FECA. The Secretary of Labor has the final say over whether a particular injury is compensable under FECA, and the federal courts are barred from reviewing that decision. *Fuqua v. U.S. Postal Service*, 607 Fed. App'x 570, 572 (7th Cir. 2015) (citing 5 U.S.C. § 8128(b); 8145).[4] The Supreme Court has held that this language clearly states the unambiguous intent of Congress to bar judicial review of FECA determinations by the Secretary of Labor. *Lindahl v. Office of Personnel Management*, 470 U.S. 768, 780 and n.13 (1985).

If a claim is covered under FECA, then the federal courts have no subject matter jurisdiction to entertain the action, since the United States has not otherwise waived its sovereign

---

[4] However, FECA provides several avenues for administrative review such as reconsideration, hearing, and appellate review by the Employees' Compensation Appeals Board ("ECAB"). 5 U.S.C. § 8124, 20 C.F.R. § 10.616; 5 U.S.C. § 8128, 20 C.F.R. § 10.606; 20 C.F.R. § 10.607; 20 C.F.R. § 10.625 and § 501.3(d). The ECAB issues final decisions on appeals relating to coverage under FECA or by a court by mandamus or otherwise. 5 U.S.C. § 8128(b).

immunity to suit. *Ezekiel,* 66 F.3d at 898. Put another way, an injured employee may not bring an FTCA action against the United States when the injury occurred in the performance of the employee's duty so as to bring it within FECA coverage. 5 U.S.C. § 8116(c); 28 U.S.C. § 1346, § 2671 et seq., *Tippetts v. United States*, 308 F.3d 1091, 1094 (10th Cir. 2002) (citing *Sw. Marine, Inc. v. Gizoni*, 502 U.S. 81, 90, (1991) ("[T]he courts have no jurisdiction over FTCA claims where the Secretary of Labor determines that FECA applies.")); *Moe v. United States,* 326 F.3d 1065, 1068 (9th Cir. 2003) ("if compensation is available under FECA, all other statutory remedies for claims arising under the same facts are preempted"). The same is true for claims asserted by a deceased employee's estate or its representatives. *See, e.g., Lockheed Aircraft Corp. v. United States*, 460 U.S. 190, 193-94 (1983); *Pourier v. United States*, 138 F.3d 1267 (8th Cir. 1998) (estate's exclusive remedy for claims arising from death of nurse employed by the federal government was under FECA and, thus, FTCA claims were barred); *Saltsman v. United States*, 104 F.3d 787, 790-91 (6th Cir. 1997) ("In the instant case, FECA bars every claim asserted by the spouses of the deceased and injured employees, as well as the claims on behalf of the Saltsmans' daughter: those claims seek to recover damages suffered precisely because the death or injury of a given employee has impaired the special relationship between that employee and his or her spouse or dependant."); *Dlugolinski v. United States*, 2005 WL 8171759 (N.D. Oh. Aug. 29, 2005) ("Thus, where a federal employee is covered by FECA, any action by the employee or his dependents under the Federal Tort Claims Act is explicitly preempted.").

The Sixth Circuit's decision in *Throckmorton v. Director of the U.S. Peace Corps*, 787 F.2d 593 (6th Cir. 1986), informs the claim in this case. In *Throckmorton*, the plaintiff brought an FTCA complaint for injuries she suffered as a Peace Corps volunteer in Mali. *Id.* at *1. The plaintiff had repeatedly requested medical evacuation for an ongoing health condition and

eventually was medically evacuated.  *Id.*  Following her medical evacuation and surgery, the Peace Corps medically terminated the plaintiff from her service.  *Id.*  The plaintiff then sought compensation under FECA; however, while her FECA compensation request was pending for numerous months, the plaintiff also filed an FTCA lawsuit.  *Id.* at 2.  On appeal, the plaintiff challenged the district court's conclusion that the plaintiff could not maintain an FTCA claim for the injuries she allegedly suffered while in Mali.  In affirming the district court's decision, the Sixth Circuit determined that the district court correctly held that FECA covered the appellant's injuries that occurred while she was performing her duties as a Peace Corps volunteer because the law provided "sweeping coverage under FECA for Peace Corps volunteers." *Id.* at *2. The court of appeals also determined that the plaintiff could not bring an FTCA claim for alleged medical malpractice despite her contention that the FECA coverage was unsatisfactory because the plaintiff's remedy under FECA "represents the employee's exclusive remedy against the United States." *Id.* at *3. (The Sixth Circuit also determined that the FTCA claim was barred by the FTCA's foreign country exception. *Id.* at *4).  The same result applies to the Heiderman estate's wrongful death claim.

Similar to *Throckmorton*, FECA is the exclusive remedy for the estate's wrongful death claim.  As a preliminary matter, Peace Corps volunteers are entitled to death and disability benefits under FECA.  5 U.S.C. § 8142; 20 C.F.R. § 10.730; 20 C.F.R. § 10.731; *see also* 2-1701 FECA Procedure Manual, 2-1701 Peace Corps Cases, Section F (Death Claims) available at https://www.dol.gov/agencies/owcp/dfec/regs/compliance/DFECfolio/FECA-PT2/group5#21701 (last accessed on March 16, 2021).  There is also no dispute that Heiderman was a Peace Corps volunteer at the time of her death and that she contracted malaria while serving in the Peace Corps. In addition, there is a statutory presumption that an injury or death of a Peace Corps volunteer

overseas was deemed proximately caused by his employment. *See* 5 U.S.C. 8142(c)(3). Finally, the wrongful death claim, which is asserted by the estate and seeks damages that the family is alleged to have suffered because of Heiderman's death, arises from the work-related illness that caused Heiderman's death. *See, e.g., Metz v. United States*, 723 F. Supp. 1133 (D. Md. 1989) (FECA was exclusive remedy for widow and daughter of government employee's wrongful death and survival action claims). Thus, the estate's wrongful death claim may be eligible for FECA and should be dismissed.

Alternatively, the case should be stayed because a "substantial question" exists as to whether FECA applies. "If an injured federal employee sues the United States under the FTCA for a work-related injury, but has not submitted a FECA claim, the court must determine whether there is a '"substantial question of FECA coverage."' *Stennis v. Armstrong*, 2019 WL 6327422, at *2 (N.D. Ill. Nov. 26, 2019) (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 81 (2d Cir. 2008)). If a substantial question exists, the district court must "stay the proceeding, holding the claim in abeyance, or otherwise maintain the case on the court's inactive docket" so the plaintiff can file a FECA claim and learn whether the FECA covers her injury." *Stennis*, 2019 WL 6327422, at *2; *see also Fuqua*, 607 Fed. App'x. at 572 (citing *Mathirampuzha*, 548 F.3d at 85); *Gill v. United States*, 471 F.3d 204, 208-09 (1st Cir. 2006); *Tippetts v. United States*, 308 F.3d 1091, 1095 (10th Cir. 2002); *Noble v. United States*, 216 F.3d 1229, 1235 (11th Cir. 2000); *White v. United States*, 143 F.3d 232, 237–38 (5th Cir. 1998); *Figueroa v. United States*, 7 F.3d 1405, 1408 (9th Cir. 1993); *Luczyszyn v. G.S.A,* 569 F. Supp. 306, 309 (E.D. Pa. 1983). If the Secretary decides that the FECA does not cover a plaintiff's claims, then the plaintiff may pursue an FTCA claim against the United States. *Stennis*, 2019 WL 6327422, at *4. A substantial question of FECA coverage exists "unless the court determines 'as a matter of law that, viewing all of the circumstances, the

Secretary could not find FECA coverage of' the alleged injury." *Noble*, 216 F.3d at 1235 (internal citation and quotation marks omitted). Stated differently, a substantial question exists unless it is "certain" that the Secretary would "find no coverage." *White v. United States*, 143 F.3d 232, 234 (5th Cir. 1998); *Bruni v. United States*, 964 F.2d 76, 79 (1st Cir. 1992); *see Mathirampuzha*, 548 F.3d at 81.

Here, a substantial question exists as to whether the Bernice Heiderman's injury occurred in the performance of her duties as a Peace Corps volunteer. The allegations supporting the estate's wrongful death claim involve Heiderman's time in Comoros as a Peace Corps volunteer. In addition, the allegations implicate the health care that was provided to her by Peace Corps medical personnel as part of her Peace Corps employment. Thus, because Heiderman was serving as a Peace Corps volunteer at the time she contracted malaria and subsequently died, at a minimum, a substantial question exists as to whether FECA coverage exists.

The estate has not yet filed a claim under FECA. However, the court can order the estate to file a FECA claim and stay this litigation if the claim is not dismissed for another reason. In *Luczyszyn v. General Services Administration*, the district court ordered plaintiff to file a FECA claim within 45 days of its order, and declared that plaintiff's failure to file a FECA claim within the 45-day period would result in the dismissal of the claim with prejudice. 569 F. Supp. 306, 309 (E.D. Pa. 1983); *Gustafson v. Thomas*, 2012 WL 1866407, at *4 (N.D. Ill. May 22, 2012) ("Until a determination is made [by the Secretary of Labor], the motion to stay proceedings against the United States is granted."). The United States requests the court to do the same here.

### III.    Negligent Handling of Remains (Count IV)

Despite its label of "negligence," the family's allegations that the Peace Corps was neither forthcoming nor accurate about the delivery of Heiderman's remains really constitutes a misrepresentation claim, which is barred by the FTCA's intentional tort exception.

The FTCA bars "[a]ny claim arising out of . . . misrepresentation." 28 U.S.C. 2680(h). The scope of this exception is a matter of federal law: whether a claim is precluded is solely dependent upon what Congress meant, not whether state law would allow recovery under analogous circumstances. *United States v. Neustadt*, 366 U.S. 696, 705-06 (1961). The Seventh Circuit has explained that "a complaint alleging claims under the FTCA should be examined to determine whether the claims are based on the government's failure to use due care in communicating information upon which the recipient relies." *Janowsky v. United States*, 913 F.2d 393, 396 (7th Cir. 1990) (plaintiff's allegation that FBI negligently provided incorrect legal advice and incorrect financial advice barred by misrepresentation exclusion). Because negligence often underlies an inaccurate representation, a court should determine whether the "real cause of the complaint" is a misrepresentation within the meaning of § 2680(h). *Id.* at 396-97; *see also Schneider v. United* States, 936 F.2d 956, 961 (7th Cir. 1992) (holding that the question is whether the government's misstatement is "essential" to the claim). If so, the claim is barred by the misrepresentation exception. *See generally Janowsky,* 913 F.2d at 396. Further, whether the claim is couched in terms of willfulness or negligence is irrelevant under the intentional-tort exception. In *United States v. Neustadt*, the Supreme Court established the basic premise that the exception cannot be circumvented by artful phrasing of the complaint. 366 U.S. 696, 705-06 (1961). It held that the exception bars claims for "negligent, as well as willful, misrepresentation," and rejected the notion that the exception "does not apply when the gist of the action lies in *negligence* rather

than misrepresentation." *Id.* at 702-03; *see, e.g., Deloria v. Veterans Administration*, 927 F.2d 1009, 1012-13 (7th Cir. 1991) ("[Plaintiff] cannot sidestep the statutory limits of the FTCA by artfully couching his complaint in different jargon[.]").

The bedrock of the plaintiffs' negligent handling of remains claim is that the United States either conveyed false information or failed to convey accurate information regarding the shipment and delivery of Heiderman's remains. For example, plaintiffs allege that when the family asked officials where Heiderman's remains were, they were allegedly told: "We are not sure." Compl. ¶ 101. The family also alleges that Heiderman's remains "did not arrive as promised" and, as a result, Heiderman's funeral went forward without her remains being present. *Id.* ¶ 103. The family also repeatedly allege that the Peace Corps' statements regarding the timing of the delivery of the remains led to a "string of false alarms." *Id.* at Introduction, ¶¶ 103, 106. Simply put, the complaint sets forth a landscape where the family repeatedly asked for the status of the shipment of Heiderman's remains and officials allegedly told the family that it either did not know where the remains were or incorrectly told them that the remains would be delivered by a certain date. And, in reliance upon this allegedly incorrect information, the family scheduled, planned, and went forward with Heiderman's funeral despite not having her remains. While the family captions this claim as negligent handling of remains, the basis of the claim arises out of alleged misrepresentations made by Peace Corps personnel. Further, the damages that the plaintiffs have suffered as a result of these events would not have happened but for the Peace Corps's alleged misstatements. *See, e.g., Nicklas v. United States*, 2014 WL 309323 (N.D. Ill. Jan. 27, 2014) (plaintiff's claim that she suffered emotional distress as a result of a VA physician's misstatements regarding the cause of her husband's death constituted a misrepresentation claim and, thus, was barred by the intentional tort exception). Ultimately, because the United States retains its

20

sovereign immunity with respect to claims of misrepresentation—regardless of the technical terms in which they are framed—the court should dismiss the plaintiffs' negligent handling of remains claim for lack of jurisdiction.

## IV. Intentional Infliction of Emotional Distress (Count II)

Next, while the family complains that the United States' actions following Heiderman's death constitute intentional infliction of emotional distress, this claim must be dismissed because the conduct alleged does not constitute extreme or outrageous conduct.

To state a claim under Illinois law for intentional infliction of emotional distress, plaintiffs must allege that: (1) the conduct involved was truly extreme and outrageous; (2) the actor either intended that his conduct would cause severe emotional distress or knew that there was at least a high probability that his conduct would cause severe emotional distress; and (3) the conduct must in fact have caused severe emotional distress. *Feltmeier v. Feltmeier*, 207 Ill.2d 263 (Ill. 2003). "If the complaint fails to make a sufficient showing of any one of these three elements, it fails as a matter of law." *Chang Hyun Moon v. Kang Jun Liu*, 44 N.E.3d 1134, 1142 (Ill. App. Ct. 2015). In this case, the family's allegations do not fulfill the first element of an intentional infliction of emotional distress claim and, thus, the claim fails as a matter of law.

To qualify as extreme and outrageous, the conduct must be "so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Schweihs v. Chase Home Fin.*, 77 N.E.3d 50, 63 (Ill. 2016). Indeed, it "has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." *Id.* (quoting

Torts § 46 cmt. d, at 73 (1965)). The Illinois Supreme Court "has described a number of nonexclusive factors that may inform this analysis, including: the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Cobige v. City of Chicago*, 2009 WL 2413798, at *13 (N.D. Ill. Aug. 6, 2009) (quoting *Lewis v. School Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008). In addition, a pattern of misbehavior may raise offensive acts into actionably outrageous ones. *Id.* No factor alone is dispositive, and courts must consider the facts and circumstances of any particular case. *Schweihs*, 77 N.E.3d at 63; *see also Richards v. U.S. Steel*, 869 F.3d 557, 567 (7th Cir. 2017).

The thrust of the family's complaint is that the Peace Corps's actions towards a grieving family may have been insensitive or even incompetent, but the allegations do not come close to demonstrating "extreme and outrageous" conduct. In support of their claim, plaintiffs allege that the Peace Corps's wrongful conduct included: (1) officials "blaming" Heiderman for her own death when they told the family that she "probably did not take her [malaria-prevention] medication," (Compl. ¶¶ 95, 134); (2) officials "arguing" with the Heiderman family that Bernice should have "self-diagnosed her own illness" (*id.* ¶ 134); (3) officials "earmarking donations made in Ms. Heiderman's name for 'malaria prevention'" (*id.*); and (4) "bungling the return of Ms. Heiderman's body to the Heiderman family," (*id.*). Whether considered independently or collectively, these actions are neither "extreme" nor "outrageous" under Illinois tort law.

The Peace Corps's alleged statements to the Heiderman family addressing whether Heiderman should have requested a malaria test, whether she was taking her malaria-prevention medication (which was required by the Peace Corps), and the Peace Corps's intention to donate

funds to malaria prevention are neither extreme nor outrageous. Rather, these statements conveyed details to the Heiderman family regarding Heiderman's death and events subsequent to her death. At best, these statements and actions constitute fair and accurate assessments of Heiderman's condition, the circumstances surrounding her death, and efforts to honor Heiderman's memory. At worst, these statements and actions demonstrate a poor judgment call as to the manner and content of the information that should have been conveyed to a grieving family. *See, e.g., Mogul v. SCI Ill. Services, Inc.* 2019 WL 4138214, \*2, \*8 (Ill. App. Ct. Aug. 30, 2019) (plaintiffs' allegations that cemetery failed to admit to family that it sold the decedent's burial plot to someone else, the cemetery "attempted to blame" family for plot confusion, and the cemetery caused family to believe that no plot would be available for the immediate burial of Jewish mother did not constitute extreme and outrageous conduct); *Taliani v. Resurrection*, 115 N.E.3d 1245 (Ill. App. Ct. 2018) ("although arguably insensitive and inconsiderate" father's denial of visitation to see son's remains by ex-wife, funeral home, and funeral home director did not constitute extreme and outrageous conduct). Further, while the family may have been upset that donations in Heiderman's honor were directed to a specific charitable cause, this hardly constitutes behavior that was "atrocious, and utterly intolerable in a civilized community." Regardless of how it was received by the Heiderman family, these letters and donations demonstrate the Peace Corps' earnest attempt to honor Heiderman's memory.

The same is true for the Peace Corps's decision to convey certain details surrounding the location and shipment of Heiderman's remains—whether accurate or not. The factual background and the district court's reasoning in *LaLoup v. United States*, 29 F. Supp. 3d 530 (E.D. Pa. 2014), is instructive. In *LaLoup*, a United States marine died while stationed in Greece. The family brought a series of claims against the United States, the Department of Defense, Greece, and a

23

Greek hospital asserting claims for the mishandling of the marine's body and intentional infliction and negligent infliction of emotional distress, arising from the removal of the marine's heart during the autopsy. In support of their intentional infliction of emotional distress claim, the parents alleged that the United States wrongfully told the family that the son's remains were missing a piece of his scalp, but then later told the family that her son's heart was missing. *Id.* at 535. The district court concluded that "*even if both decisions were intentional or reckless*, neither is 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency . . . .'" *Id.* at 543 (emphasis added). The court explained that "[r]ather than 'extreme or outrageous,' the decisions reflect contrary approaches to relaying uncomfortable facts to a grieving parent." *Id.* Thus, the district court dismissed the family's intentional infliction of emotional distress claim.

As an initial matter, to the extent that the family's intentional infliction of emotional distress claim relies upon the fact that the Peace Corps delayed the delivery of Heiderman's remains or were not entirely accurate regarding the status of the delivery of the remains, the FTCA's intentional tort exception similarly bars these claims for the exact reasons as explained above. Further, while the family complains that the United States delayed the shipment of Heiderman's remains or insensitively told the Heiderman family that they did not know where Heiderman's remains were located, this is not extreme or outrageous conduct that "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Notably, the complaint does not allege that the Peace Corps's actions were intentionally callous, nor does it allege that the Peace Corps recklessly conveyed false information. Rather, the family complains that the Peace Corps failed to provide as accurate as information as possible relating to the complex shipment of Heiderman's remains. And, similar to *LaLoup*, the Peace Corps' statements reflect the very difficult decision to convey only certain details to a

grieving parent. Ultimately, there is no possible reading of the facts that suggests that the United States' actions were extreme or outrageous as those terms are defined for purposes of Illinois tort law. Thus, the family's intentional infliction of emotional distress claim should be dismissed.

## V.     Negligent Infliction of Emotional Distress (Count III)

Finally, the family fails to state a negligent infliction of emotional distress claim because the family does not (and cannot) allege any concurrent physical contact, injury, or impact as a result of the Peace Corp's actions. To state a claim for negligent infliction of emotional distress, a plaintiff must allege "the traditional elements of negligence: duty, breach, causation, and damages." *Schweihs*, 77 N.E.3d at 58; *see also Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 703 (7th Cir. 2009). "Illinois law imposes different standards for 'direct' and 'bystander' negligent infliction of emotional distress plaintiffs." *Doe v. Loyola U. of Chic.*, 2019 WL 3801819, at *3 (N.D. Ill. Aug. 13, 2019) (citing *Schweihs*, 77 N.E.3d at 58). The family's complaint indicates that they are pursuing a "direct" negligent infliction of emotional distress claim. *See* Compl. Count III (titled: "Negligent Infliction of Emotional Distress (Direct)").

In addition to the basic elements for this claim, "a direct victim of alleged negligent infliction of emotional distress must satisfy the 'impact' rule." *Doe*, 2019 WL 3801819, *3 (citing *Lewis*, 561 F.3d at 703). "Under the impact rule, a direct victim may not recover . . . unless the emotional distress 'was accompanied by a contemporaneous physical injury to or impact on the plaintiff." *Lewis*, 561 F.3d at 703. A direct victim need not allege that he "suffer[ed] physical manifestations resulting from the emotional distress . . . ; emotional injuries alone will suffice." *Id.*; *see also Schweihs*, 77 N.E.3d at 61 (explaining that *Corgan* held that a direct victim plaintiff need not allege "that she suffered a physical symptom of her emotional distress," but "did not

eliminate the need for a direct victim to allege and prove a contemporaneous physical injury or impact").

The family fails to allege that they suffered a *contemporaneous* physical impact or injury. The family relies upon the same allegations for their negligent infliction claim as they did their intentional infliction of emotional distress claim. *Compare* Compl. ¶ 145 *with id.* ¶ 134. The family also alleges, that as a result of the Peace Corps's actions, they have suffered "severe and extreme emotional distress, including corresponding physical effects." *Id.* ¶ 148. This allegation fails to suffice under Illinois law. To state a claim under the impact rule, plaintiffs are *not* required to allege that they suffered physical effects as a result of their emotional distress claim. However, to state a claim under the impact rule, plaintiffs *are* required to "allege 'a physical injury or impact' that was 'contemporaneous with (and thus necessarily distinct from) his emotional distress'" *Doe,* 2019 WL 3801819, at *4 (citing *Schweihs,* 77 N.E.3d at 62); *see id.* ("Doe gets the impact rule backward. He need not—but does—allege that he suffered 'physical symptom[s] of [his] emotional distress." And he must—but does not—allege a physical injury or impact that was contemporaneous with (and thus necessarily distinct from his emotional distress.")). Simply put, the family does not (and cannot) allege any concurrent physical contact, injury, or impact as a result of the Peace Corps's actions. Thus, the family's negligent infliction of emotional distress claim should be dismissed. *See, e.g., Lozier v. Quincy U. Corp.*, 2019 WL 409368, at *6 (C.D. Ill. Jan. 31, 2019) ("Under Illinois law, a claim for negligent infliction of emotional distress must include an allegation of contemporaneous physical injury or impact. Plaintiff's Complaint contains no such allegations. The allegation that Plaintiff suffered past, present, and future physical pain is not an allegation of contemporaneous physical injury or impact.") (internal citation and quotation marks omitted); *Schweihs,* 77 N.E.3d at 56, 62 (affirming the dismissal of a negligent infliction of

26

emotional distress claim where the plaintiff alleged that she suffered physical symptoms of emotional distress but "did not plead any physical contact").

## Conclusion

For the above reasons, the court should grant the United States' motion to dismiss.

Respectfully submitted,

JOHN R. LAUSCH, Jr.
United States Attorney

By: s/ Kathleen Marie Flannery
    KATHLEEN MARIE FLANNERY
    Assistant United States Attorney
    219 South Dearborn Street
    Chicago, Illinois 60604
    (312) 353-7223
    kathleen.flannery@usdoj.gov